UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BRIAN SHIFRIN and MELANIE SHIFRIN,       )
     *Plaintiffs*,       )
            )
*vs.*       )       1:12-cv-01011-JMS-DKL
            )
LIBERTY MUTUAL INSURANCE,       )
     *Defendant.*       )

## ORDER

Presently pending before the Court are: (1) a Motion for Summary Judgment filed by Defendant Liberty Mutual Insurance ("Liberty"), [dkt. 24]; (2) a Cross-Motion for Summary Judgment filed by *pro se* Plaintiffs Brian Shifrin and Melanie Shifrin ("the Shifrins"), [dkt. 46]; and (3) a Request for Expedited Consideration filed by the Shifrins, [dkt. 103].

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can

result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

The fact that cross-motions for summary judgment have been filed does not automatically mean that all questions of material fact have been resolved. *Franklin v. City of Evanston*, 384 F.3d 838, 842 (7th Cir. 2004). The Court must evaluate each motion independently, making all reasonable inferences in favor of the non-moving party with respect to each motion. *Id.* at 843.

After assessing the parties' claims in accordance with the standards outlined above, the Court concludes that Liberty is entitled to summary judgment. Therefore, the facts detailed below contain all reasonable inferences in favor of the Shifrins. *See Celotex*, 477 U.S. at 330 n.2.

## II.
### BACKGROUND

The Court finds the following to be the undisputed facts, supported by admissible evidence in the record:[1]

### A.  The Policy

The Shifrins purchased homeowners insurance from Liberty, and Liberty issued policy number H37-248-360452-400-3, which was effective from August 13, 2010 through August 13, 2011 (the "Policy").  [Dkt. 25-2 at 1, ¶ 3; 12.]  The Policy provided "Dwelling with Expanded Replacement Cost" coverage limits of $123,700, and coverage for "Other Structures on Residence Premises" of $12,370, but those limits were modified by the Policy's Inflation Protection Provision to reflect an increase due to inflation.  [*Id.* at 12; 25-3 at 21.]  The Policy covered a home located in Fortville, Indiana that the Shifrins purchased in August 2010 for $123,000.  [Dkt. 48-1 at 1-2, ¶ 4.]

The Policy provisions relevant to this matter include the following:

**Homeprotector Plus Endorsement, B.3.:**  Loss Settlement.  Covered property losses are settled as follows:  a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following: (1) We will pay the cost of repair or replacement, but not exceeding: (a) the replacement cost of that part of the building damaged using like construction on the same premises and intended for the same occupancy and use; (b) With respect to Coverage A, an amount not exceeding 20% greater than the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy; (c) With respect to Coverage B, the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy; (d) the amount actually and necessarily spent to repair or replace the damage. (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

---

[1] The Court recognizes that it must view the facts in the light most favorable to the Shifrins, but the Shifrins must support the facts that they assert with admissible, record evidence.  Fed. R. Civ. P. 56(c)(1)(A).  While the Shifrins take issue with some of the facts Liberty has presented, in most circumstances they have not submitted admissible evidence to counter those facts.  Accordingly, the Court considers those facts undisputed.  Fed. R. Civ. P. 56(e)(2).

Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above. However, if the cost to repair or replace the damage is both: (a) Less than 5% of the amount of insurance in this policy on the building; and (b) Less than $2500; We will settle the loss according to the provisions of a.(1) above whether or not actual repair or replacement is complete….d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

**I.-Conditions. 2. Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done: a. Give prompt notice to us or our agent;…d. Protect the property from further damage. If repairs to the property are required, you must: (1) Make reasonable and necessary repairs to protect the property; and (2) Keep an accurate record of repair expenses….

**I.-Conditions. 6. Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss….

**I.-Conditions. 8. Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss. [As modified by Endorsement with special Indiana provisions].

**I.-Conditions. 9. Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

**I.-Conditions. 10. Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and: a. Reach an agreement with you; b. There is an entry of a final judgment; or c. There is a filing of an appraisal award with us.

**I and II.-Conditions. 6. Nonrenewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

[Dkts. 25-2 at 15-16, 26; 25-3 at 2, 8, 11.]

**B.  The Tornado**

On February 28, 2011, the Shifrins' home was damaged by a tornado.  [Dkt. 48-1 at 4, ¶ 18.]  Mr. Shifrin reported the tornado damage to Liberty on March 3, 2011.  [*Id.* at 5, ¶ 23.]

**C.  Actions Taken by Liberty**

Liberty's claims adjuster, Scott Fearrin, inspected the Shifrins' property on March 8, 2011, and determined that the damage to a barn on the property likely exceeded the coverage available under the Policy for "Other Structures on Residence Premises."  [Dkts. 25-2 at 2, ¶ 5; 48-1 at 6, ¶ 27.]  On March 22, 2011, Liberty issued a check for $14,226.00 to the Shifrins and their mortgage carrier, Flagstar Bank, for the damage to the barn on the insured property.  [*Id.* at 2, ¶ 6; 48-1 at 7, ¶¶ 40-41.]  The payment was actually in excess of the "Other Structures on Residence Premises" Policy limit, because Mr. Fearrin mistakenly included a 10% Inflation Protection factor instead of the 1% Inflation Protection factor provided for in the Policy.  [Dkt. 25-2 at 2, ¶ 6.]

During his initial inspection, Mr. Fearrin also observed that the roof of the house had "substantial damage," and there was resulting interior water damage.  [Dkt. 25-2 at 3, ¶ 7.]  Mr. Fearrin advised the Shifrins on March 8, 2011 that they needed to replace the roof immediately in order to protect the property from further damage.  [*Id.; see also* dkt. 48-24 at 12 (March 8, 2011 claims log submitted by the Shifrins wherein Mr. Fearrin noted "I have explained to [insured] we need to get roof replaced before mitigation and estimating can be completed").]  On April 4, 2011, at Mr. Shifrin's request, Mr. Fearrin provided him with an estimate for damages to the barn under the "Other Structures on Residence Premises" coverage (which correlated with the March 22, 2011 payment), along with an estimate to repair the damaged roof.  [Dkt. 48-15.]

On April 11, 2011, Mr. Fearrin spoke with the Shifrins who requested that Liberty pay for the tear out of water-damaged dry wall.  [Dkt. 25-2 at 3, ¶ 8.]  However, because the Shifrins had not yet selected a roofing contractor or repaired the damaged roof, Mr. Fearrin advised them that they first needed to repair the roof before interior remediation and repair could begin.  [*Id.* at 3, ¶ 8.]

On April 13, 2011, Mr. Shifrin emailed Mr. Fearrin with an itemization of numerous repairs, and suggested that the damage to the house was too extensive to repair.  [*Id.* at 3, ¶ 9.]  In response, Mr. Fearrin called Mr. Shifrin two days later and agreed to inspect the property again on April 22, 2011 with Service Master, a company retained by Liberty to assess possible moisture in the house.  [*Id.* at 3, ¶¶ 10-11.]  During the inspection, Mr. Fearrin observed that there was additional moisture damage inside the house that had occurred since his March 8, 2011 inspection.  [*Id.*]  Mr. Fearrin agreed to prepare an estimate for the damage based on what he believed was related to the loss, and again reminded the Shifrins that they were obligated to protect their property from further damage and that if they did not replace the roof soon, they would be in violation of the Policy.  [*Id.* at 3-4, ¶ 12.]

On April 28, 2011, Mr. Fearrin determined that the replacement cost value for the damage to the house was $29,486.08 and that depreciation on the property was $6,722.39, for a net of $22,713.69 actual cash value.  [*Id.* at 4, ¶ 13.]  Liberty issued a check in that amount to the Shifrins and Flagstar Bank, as "a portion of the damages to the insured dwelling."  [*Id.*; *see also* dkt. 48-23 (email from Mr. Fearrin to Mr. Shifrin enclosing estimate – which covered roof repair, and certain repairs to office, laundry room, hallway, three bedrooms, two bathrooms, kitchen, living room, family room, rear elevation, right elevation, and basement – and stating that there were still "some open items").

On May 5, 2011, the Shifrins advised Mr. Fearrin that they believed there was additional damage to the foundation of the house that had not been previously reported and so was not included in prior estimates. [Dkt. 25-2 at 4, ¶ 14.] In response, Mr. Fearrin retained an engineer from Donan Engineering ("Donan") to examine the property. [*Id.*] Donan inspected the house on May 25, 2011, and provided Liberty with a report on June 9, 2011. [*Id.* at 4, ¶ 15.] Donan determined that cracks on the east end of the basement's north wall were related to the tornado, but were not structural and could be repaired. [*Id.* at 4, ¶ 16.] The Donan report also found that a horizontal crack near the midpoint of the north basement wall was caused by the basement wall bowing in from saturated soil due to water intrusion through the crack. [*Id.*] The Donan report concluded that the soil was saturated due to a long term problem with efflorescence on the wall, and was not caused by the February 28, 2011 tornado. [*Id.* at 4-5, ¶ 16.] Mr. Fearrin relied on the Donan report in continuing to adjust the Shifrins' claim, and routinely relies on such reports in those circumstances. [*Id.* at 5, ¶ 18.]

Liberty provided the Shifrins with a copy of the Donan report on June 17, 2011, and offered to issue the Shifrins a supplemental payment to repair the cracks after the Shifrins had selected a contractor to do the work. [*Id.* at 5, ¶ 19.] On June 27, 2011, the Shifrins sent Mr. Fearrin an email disputing the Donan report, and Mr. Fearrin responded by requesting that the Shifrins provide him with "a copy of your engineer report for my review." [*Id.* at 5, ¶ 20; 25-4 at

12-14.][2]  Mr. Fearrin again requested documentation disputing the Donan report on July 6, 2011,

advised the Shifrins that they could hire their own engineer, and also advised the Shifrins of their

right under the Policy to an appraisal if they disputed the Donan report.  [Dkts. 25-2 at 5, ¶ 21;

25-4 at 20.]  Mr. Fearrin requested that the Shifrins provide him with copies of any estimates

several times, and noted that an estimate Mr. Shifrin had provided was expired.  [Dkts. 25-2 at 6,

¶¶ 22-23; 25-4 at 26.]  Mr. Fearrin also requested that the Shifrins select a contractor to perform

the work, and have that contractor contact the adjuster to schedule an inspection of the property

with that contractor to determine the damages.  [Dkts. 25-2 at 6, ¶ 23; 25-5 at 1.]

On September 8, 2011, the Shifrins advised Mr. Fearrin via email that they had scheduled

an appointment with a restoration contractor for September 13, 2011, but did not identify the

contractor or state that they would coordinate an inspection of the property with the contractor.

[Dkts. 25-2 at 6, ¶ 24; 25-5 at 4.]  Kevin May, a Liberty claims supervisor and Mr. Fearrin's

manager, emailed the Shifrins on September 12, 2011, asking for the time the contractor would

be available to meet at the September 13, 2011 inspection.  [Dkt. 25-1 at 1, ¶ 3; 5.]  Mr. Shifrin

responded to Mr. May the same day via email, stating "I am sorry.  But this would be awkward,

it is our first meeting.  He is not expecting to see [Liberty] people there.  He need[s] to cover

---

[2] The Court notes that Liberty filed exhibits to Mr. Fearrin's affidavit in a haphazard fashion that
has made the Court's review of Liberty's motion extremely cumbersome.  For example, part of
Exhibit 2 appears at dkt. 25-3, while the remainder of that exhibit appears at dkt. 25-4.  Even
more inconvenient, Liberty did not describe each docket entry in its title when filing the exhibits
on CM/ECF.  [*See, e.g.*, dkt. 25-4, which includes part of Exhibit 2, Exhibits 3 through 6, and
only the cover page of Exhibit 7, is titled "Exhibit Ex 2 – Part 2 – Fearrin Aff."]  These generic
titles do not assist the Court in locating documents referenced in the affidavits and briefs, and are
confusing.  Liberty is directed to the Court's Practice and Procedures, found on the district
court's website, which provide that when electronically filing exhibits the parties "should not
only number the exhibits, but should also add a descriptive identifier for the exhibits, e.g., 'Ex-
hibit 1 – Affidavit of John Smith'…."  The Practices and Procedures also provide that, to the ex-
tent possible, exhibits should be filed as attachments to motions, so that the brief can then use the
docket citation for the exhibit, and that "[d]oing so significantly facilitates review of the motion."

scope of repairs, has Scott[']s estimate, copy of the policy, will work on that for a couple of days and he said would be more than…willing to walk with adjuster and explain difference if any." [*Id.* at 5.]  Mr. Fearrin requested information regarding the contractor from the Shifrins on both September 15, 2011 and September 22, 2011.  [Dkts. 25-2 at 6, ¶ 25; 25-5 at 6, 10.]

Sometime between September 22, 2011 and September 27, 2011, the Shifrins forwarded to Mr. Fearrin what they represented was an estimate from a contractor, but the estimate did not contain any information reflecting the contractor's identity.  [Dkts. 25-2 at 6-7, ¶ 26; 25-5 at 13-25; 25-6; 25-7; 25-8; 25-9; 25-10 at 1-3.]  On September 27, 2011, Mr. Fearrin sent Mr. Shifrin an email requesting the missing information.  [Dkts. 25-2 at 6-7, ¶ 26; 25-10 at 5.]  On September 28, 2011, Mr. May spoke with Mr. Shifrin and requested the name and number of the contractor that had prepared the estimate, so that Liberty could discuss the estimate directly with the contractor.  [Dkt. 25-1 at 2, ¶ 4.]  Mr. Shifrin initially refused to provide the information.  [*Id.*]

On October 4, 2011, Mr. Fearrin obtained an agreement from Mr. Shifrin to meet with the contractor the Shifrins had selected.  [Dkt. 25-2 at 7, ¶ 27.]  The meeting occurred on October 10, 2011, and Mr. Fearrin discussed the scope of the loss with the contractor and the two reached an agreement regarding what work was necessary to repair the house.  [*Id.*]  On October 14, 2011, Mr. Fearrin completed a revised estimate for the repairs and sent it to the Shifrins' contractor in an effort to reach an agreement with the Shifrins on the claim.  [*Id.* at 7, ¶ 28.]  Mr. Fearrin and the contractor spoke on October 25, 2011, and reached an agreement regarding the price for the contractor to complete the repairs.  [*Id.*]  Mr. Fearrin forwarded a copy of the estimate to the Shifrins (which totaled $36,950.54, reflecting an initial amount of $47,769.92 less depreciation), advised them that he had reached an agreement with the contractor regarding the costs of repair, and sent a supplemental payment to the Shifrins.  [Dkts. 25-2 at 7, ¶ 28; 25-10 at 8; 48-41.]  The

- 9 -

supplemental payment was for $14,237.25, which was the difference between the $36,950.54 estimate for repair agreed to by Liberty and the contractor selected by the Shifrins, and the prior payment for damages to the house ($22,713.69).  [Dkt. 25-2 at 7, ¶ 29.]  This brought total payments to $51,176.94 ($36,950.94 for the house, and $14,226 for the barn).  [*Id.* at 2, ¶ 6; 4, ¶ 13; 7, ¶ 29.]

On October 27, 2011, the Shifrins sent an email to Mr. May objecting to the agreed estimate that Mr. Fearrin had sent them, arguing that it did not include overhead and profit, replacement of the furnace, certain issues with the roof, and remediation of asbestos, lead, and mold. [Dkt. 25-1 at 2, ¶ 5; 10.]  Mr. May forwarded a revised estimate to the Shifrins on October 28, 2011, which clearly set forth the profit and overhead for the repairs.  [*Id.* at 2, ¶ 6; 13.]  Mr. May also advised the Shifrins that Liberty would only agree to pay for the repair of the damaged siding and would not pay to replace siding that was not damaged, and that the estimate included the cost of replacement of the air conditioning unit and asbestos abatement.  [*Id.*]  Additionally, he advised that water and mold remediation would be paid when the work was performed and offered to pay the remediation company directly, that lead abatement was not covered, and that the roof sheathing had been damaged due to lack of proper care to protect the property and Liberty would only pay for remediation of the roof issues caused by the initial event.  [*Id.* at 2-3, ¶ 6; 13-14.]

On October 31, 2011, after the Shifrins complained of additional damage to the house, Mr. Fearrin retained Donan to examine the roof damage to the house.  [Dkt. 25-2 at 7-8, ¶ 30.]  On November 21, 2011, Donan's engineer advised Mr. Fearrin that most of the roof damage, chimney cracking, and siding damage was due to wear and tear, and that the siding cracks had paint in them which indicated that they pre-dated the February 28, 2011 tornado.  [*Id.*]  These

conclusions are reflected in a December 6, 2011 report from Donan to Mr. Fearrin.  [Dkt. 25-10 at 11-15.]  Mr. Fearrin forwarded this latest Donan report to the Shifrins, who immediately objected to the findings as inaccurate.  [Dkt. 25-2 at 7-8, ¶¶ 30, 32.]

On December 12, 2011, Liberty invoked the mandatory appraisal provision through a December 9, 2011 letter to the Shifrins, [dkt. 25-10 at 17], but the Shifrins refused to participate in the appraisal process, [dkt. 25-2 at 8, ¶ 34; dkt. 25-10 at 19].  Also, to date the Shifrins have not provided Liberty with any evidence that they have completed any repairs on the house -- including, specifically, the roof.  [Dkt. 25-2 at 8, ¶ 35.]

### D.  The Lawsuit

The Shifrins filed a lawsuit against Liberty in Indiana state court on March 1, 2012, [dkt. 1-1 at 4-7], and Liberty removed the case to this Court on July 23, 2012, [dkt. 1].[3]  The Shifrins filed an Amended Complaint in this Court on February 6, 2013, which is the operative complaint in this case.  [Dkt. 16.]  They request declarations on various issues relating to the Policy's appraisal provision and "cooperative clause," [*id.* at 35-36], and assert claims for: (1) breach of contract, [*id.* at 36-38]; (2) negligence, [*id.* at 38]; (3) gross negligence, [*id.* at 38-39]; (4) breach of the duty of good faith and fair dealing, [*id.* at 39-40]; (5) breach of the implied covenant of good faith and fair dealing, [*id.* at 40-42]; (6) fraud/constructive fraud/intentional misrepresentation, [*id.* at 42-43]; (7) intentional infliction of physical pain and emotional distress, [*id.* at 43-44]; and (8) negligent infliction of emotional distress, [*id.* at 44].

---

[3] Liberty removed the case after the Shifrins filed an Amended Complaint on July 6, 2012 in Indiana state court, [dkt. 1-1 at 50-53], adding a claim for punitive damages that was not asserted in the original Complaint, and which pushed the amount in controversy over the "$75,000, exclusive of interest and costs" limit.  [*See* dkt. 1 at 1-2.]

**III.**

**DISCUSSION**

Liberty has moved for summary judgment on all of the Shifrins' claims,[4] [dkt. 24], and the Shifrins have filed a cross-motion for summary judgment, [dkt. 46].  In support of its motion, Liberty argues that it is entitled to summary judgment because: (1) the Shifrins have failed to comply with the Policy provisions by refusing to participate in the appraisal process and by not protecting the property from further damage, [dkt. 25 at 14-17]; (2) there is no evidence that Liberty has acted in bad faith, [*id.* at 17]; (3) the Shifrins cannot prove the elements necessary for a negligent infliction of emotional distress claim, including that they sustained an impact or witnessed an accident, [*id.*]; and (4) Liberty's conduct does not come close to the level of conduct needed to succeed on an intentional infliction of emotional distress claim, [*id.* at 18].[5]  Liberty supports its motion with affidavits from Mr. May and Mr. Fearrin.

The Court recognizes that the Shifrins are proceeding *pro se* and has made every effort to discern all of their arguments, though such discernment has admittedly been a struggle.  It appears that in response, and in support of their cross-motion, the Shifrins argue that they are entitled to summary judgment because:

1. Liberty was negligent for failing to secure the roof after the tornado in order to prevent future damage, [dkt. 47 at 15-16];

2. Liberty was grossly negligent by failing to pay for moisture remediation and refusing to allow the Shifrins to "open flooded walls," which caused mold to form, [*id.* at 16];

---

[4] Liberty filed and served the requisite notice to *pro se* plaintiff Pursuant to Local Rule 56-1 on March 13, 2013, [dkt. 31].

[5] Liberty titles Section V.F. of its brief in support of its Motion for Summary Judgment "Defendant Is Entitled to Summary Judgment on Plaintiffs' Negligent Infliction of Emotional Damage Claim," but then discusses the elements of an intentional infliction of emotional distress claim. [Dkt. 25 at 18.]  The Court assumes the heading is a typographical error, and that Liberty intended to discuss the intentional infliction of emotional distress claim in that section.

- 12 -

3. Liberty acted in bad faith by:

- refusing to pay for various items, and taking six months to create "the first reasonable estimate";

- "bogusly claiming that [it] reached a contractor agreement for everything";

- using the wrong materials for certain repairs;

- refusing to renew the Policy;

- "attempting to prevent [the Shifrins] from cashing out";

- being untruthful with the Shifrins and the Indiana Department of Insurance regarding various issues;

- demanding that it will only pay contractors directly rather than paying the Shifrins;

- altering Policy documents;

- intentionally misinterpreting Policy provisions;

- delaying in investigating the claim; and

- losing a "moisture report" given to a Liberty claims adjuster, [*id.* at 17-21];

4. Liberty improperly invoked the appraisal provision because:

- there are still disputes regarding causation, liability, and bad faith conduct, not just a dispute regarding the amount of loss;

- no "impasse" has been reached; and

- Liberty has waived the appraisal clause by losing the "moisture report," failing to pay for moisture remediation, and not appointing a disinterested appraiser, [*id.* at 21, 24-25];

5. Liberty's actions waived the Policy provision requiring the Shifrins to repair or replace the damages before receiving replacement cost coverage, [*id.*]; and

6. Liberty did not cooperate in discovery, [*id.* at 22].

In support of their motion, the Shifrins each submitted their own affidavits along with nearly five hundred pages of exhibits.  [Dkts. 48-1 to 48-62; 97-1 to 97-30.]

The Court will address the parties' arguments in turn, as they relate to each claim asserted in the Amended Complaint.

### A.  Choice of Law

A federal court sitting in diversity must apply the choice of law provisions of the forum state.  *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 879 (7th Cir. 2009) ("Because the district court's subject matter jurisdiction was based on diversity, the forum state's choice of law rules determine the applicable substantive law").  The parties agree that Indiana law applies to the Shifrins' claims.  [*See* dkts. 25 at 14; 47 at 15.]  Absent a disagreement, the Court will apply Indiana law.  *Mass. Bay Ins. Co. v. Vic Koenig Leasing*, 136 F.3d 1116, 1120 (7th Cir. 1998); *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits….*Courts do not worry about conflict of laws unless the parties disagree on which state's law applies*.  We are busy enough without creating issues that are unlikely to affect the outcome of the case (if they were likely to affect the outcome the parties would be likely to contest them)") (emphasis added).

### B.  Liberty's Challenge to the Propriety of the Lawsuit and the Shifrins' Declaratory Judgment Claim

Liberty argues in its Motion for Summary Judgment that the Shifrins cannot sue at all based on their failure to comply with the Policy provisions, which preclude them from filing the instant lawsuit under the Policy's "Suit Against Us" provision.  Liberty's arguments are inextricably intertwined with the Shifrins' declaratory judgment claim, which seeks declarations from the Court regarding:

- whether Liberty "properly invoked 'cooperative clause' stating it is 'reasonable' and 'necessary' to replace roof shingles while refusing to investigate or cover the damaged sheathing," [dkt. 16 at 36];

- whether Liberty "waived cooperative clause when stated in the letter to" the Shifrins, [*id.*];

- whether Liberty can "call for appraisal to establish amount of loss when causation, coverage, and liability for loss are in dispute, and can those be determined by appraisment," [*id.* at 35];

- whether Liberty waived its right to appraisal by "intentionally or negligently destroying unfavorable evidence," [*id.*];

- whether Liberty's "demand was [to] be made within a reasonable time under the circumstances of the case, or was the right to demand appraisal waived by [Liberty]," [*id.*];

- whether Liberty's selection of Paul Nash as its appraiser "was appropriate based on recommendation of adjuster[']s personal friend of twenty years, and for the fact that he was adjusting Liberty claims prior; [and] whether [Mr. Nash] can serve as appraiser based on existing case law [stating that he] 'must act free from bias, partiality, or prejudice in favor of either of the parties,'" [*id.*];

- whether Mr. Nash is a competent appraiser, [*id.*]; and

- whether Liberty called for appraisal in bad faith, "in [an] attempt to achieve tactical advantage over" the Shifrins, [*id.* at 36].[6]

   1. *"Cooperative Clause"*

The Shifrins' refusal to repair the roof, even after Liberty repeatedly warned them that

the Policy required them do so and that interior water damage could not be addressed until the

---

[6] The Shifrins also list as a separate issue in the declaratory judgment claim the following: "Plaintiffs also contend[] that the Appraisal Clause deprives an insured of the right to jury trial; that no order to appraise should be entertained while other issues are pending between the parties; that Liberty cannot obtain specific performance of the Appraisal Clause because of its 'unclean hands'; [and] that Liberty has not engaged in good faith dealings with its insured." [*Id.* at 36.] This passage does not request a declaration from the Court and it appears that these issues are encompassed in the previous requests for declarations. In any event, the Shifrins have not presented cogent argument in support of these assertions, if they could even be construed as stating separate claims.

roof was repaired, is really the crux of this case.  Accordingly, the Court finds it prudent to address this issue first.  The Shifrins assert that Liberty did not properly invoke the "cooperative clause" because it refused to investigate or cover damaged sheathing, and it was not reasonable or necessary to require them to replace the roof shingles when the sheathing was damaged.  [*See, e.g.*, dkt. 47 at 28-29.]  Specifically, they argue that Liberty cannot invoke the section of the Policy titled "Your Duties After Loss," which required them to "[p]rotect the property from further damage.  If repairs to the property are required, you must: (1) Make reasonable and necessary repairs to protect the property and (2) Keep an accurate record of repair expenses…."  [Dkt. 25-2 at 26.]

The undisputed evidence shows that Liberty offered to pay the Shifrins or the contractor of their choice to repair the roof shortly after the tornado.  [*See* dkts. 48-23 at 4 (Liberty estimate which included roof repair); 48-25 (email message from Mr. Shifrin to Mr. Fearrin stating "[y]ou did offer to pay for the roof and mailed us $5038.93 estimate for 30.33 sq ft complete replacement").]  The Shifrins never took the necessary action to replace the roof, instead arguing that the tarps were adequate to prevent further damage and that it would be a waste to replace shingles because the decking needed to be replaced first.  [*See, e.g.,* dkt. 48-25.]  Yet the Shifrins acknowledge that additional water damage has occurred by stating "[d]uring the rainy spring season additional damage was largely irrelevant, same wet ceiling, same wet insulation fell on a pre-damaged floor."  [Dkt. 47 at 33.]  The Policy provided that repairing the roof was the Shifrins' responsibility, not Liberty's, and the Shifrins cannot now claim that they had no duty to repair the roof because Liberty would not cover damaged decking.  Their claim is also undermined by their failure to present any evidence that the decking was damaged by the tornado and

thus covered,[7] as opposed to damaged by the water exposure after the tornado and because the roof was not replaced.  Their failure to repair the roof constituted a breach of the "Your Duties After Loss" provision of the Policy.[8]

The Court's conclusion that the Shifrins have violated the Policy's "Your Duties After Loss" provision by failing to repair the roof leads it to also conclude that the Shifrins are precluded from suing Liberty under the Policy's "Suit Against Us" provision, which states that "[n]o action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss."  [Dkt. 25-3 at 11.]  *See Knowledge A-Z, Inc. v. Sentry Ins.*, 857 N.E.2d 411, 420 (Ind. Ct. App. 2006) (provision addressing insured's duties after loss (including requirement that insured submit to examination under oath) were distinguishable from a "cooperation clause," "explicitly require[] the policyholder to perform specific duties," and "prejudice [to the insurer] is not a necessary consideration in determining the enforceability of other insurance policy provisions."  Insurer was entitled to summary judgment because insured did not satisfy duties; policy also contained a provision stating "[n]o action can be brought unless the policy provisions have been complied with…."); *Griffin v. Allstate Prop. & Cas. Ins. Co.*, 2012 U.S. Dist. LEXIS 117844, *24-25 (7th Cir. 2012) ("Compliance [with a Your Duties After Loss provision] is not optional or subject to a trial court determination of reasonableness").  Summary judgment in favor of Liberty on its challenge to the lawsuit is therefore proper.

---

[7] The Shifrins submit a photograph of the roof decking, [dkt. 48-10], but provide no foundation for it, including such basic information as when it was taken.  It is not probative evidence indicating that the decking was so damaged by the tornado that it needed to be repaired as a covered loss.

[8] The Shifrins also request a declaration regarding whether "Liberty waived cooperative clause when stated in the letter to" the Shifrins.  [Dkt. 16 at 36.]  The Shifrins do not develop this request in their briefs and the Court, without more, is unable to determine what exactly they are arguing or seeking.

In the interest of completeness, the Court will address Liberty's alternative claim that the Shifrins' refusal to participate in the appraisal process precludes this lawsuit, as well as the Shifrins' remaining requests for declaratory judgment concerning appraisal which again are intertwined with Liberty's arguments.

### 2. *Whether Liberty Has Properly Invoked the Appraisal Provision*

The Shifrins argue that it was inappropriate for Liberty to invoke the appraisal provision because they and Liberty still disagree regarding issues of causation and liability. [*See, e.g.*, dkt. 47 at 23-25.] Liberty asserts that it properly invoked the appraisal procedure because the parties affirmatively dispute the amount of loss. [Dkt. 79 at 28 ("Defendant acknowledged coverage for the claim, and issued substantial payments for their loss. Plaintiffs simply wanted Liberty to pay more. That is a dispute as to the amount of the loss. Liberty has never denied that…the storm damage was covered, and makes no such argument now").] Liberty further contends that the Shifrins' non-compliance with the appraisal process precludes their filing of this lawsuit under the "Suit Against Us" provision.

The evidence indicates that both the amount of loss, and causation, are still at issue in this case. Indeed, problematic to a quick and full resolution of the Shifrins' claim is the fact that the Shifrins have continually expanded the scope of their claim. Once Liberty issued a payment or it appeared that the parties were close to resolving the claim in its entirety, the Shifrins added items that they claimed were caused by the tornado. For example, after Liberty provided an estimate for the loss related to the tornado, and issued a check for that amount to the Shifrins, the Shifrins advised that they believed there was additional damage to the foundation. [*See* dkt. 25-2 at 3-4, ¶ 9-14.] Additionally, in October 2011 Liberty reached an agreement with a contractor selected by

the Shifrins to complete numerous repairs on the Shifrins' home,[9] and issued a check to the Shifrins and their mortgage carrier for $14,237.25.  [*Id.* at 7, ¶¶ 27-29.]  The Shifrins then complained that the agreed estimate did not include certain items.  [Dkt. 25-1 at 2, ¶ 5.]  After additional discussions wherein Liberty advised the Shifrins that it would only pay for loss caused by the tornado, that certain items (like lead abatement) were not covered by the Policy, and that certain items (like a new furnace) had not previously been claimed by the Shifrins, Liberty invoked the appraisal provision and the Shifrins refused to participate.  [*Id.* at 2-3, ¶ 6; 13.]

The Shifrins argue that the fact that causation issues remain precludes Liberty from invoking the Policy's appraisal provision.  While the Court agrees that causation issues remain, it disagrees that the existence of those issues prohibits Liberty from invoking the appraisal provision at this point.  Indiana courts have held that issues of liability should be left to the courts, but it does not appear that any Indiana courts or the Indiana Supreme Court have held that a party cannot invoke an insurance policy's appraisal provision at all when issues of causation remain. *See, e.g.*, *Weidman v. Erie Insurance Group*, 745 N.E.2d 292, 298 (Ind. Ct. App. 2001) (appraisal award "determine[s] the amount of [the insured's] loss only, and other provisions in the policy govern the extent of [the insurer's] liability for that loss"); *Travelers Prop. Cas. Co. of Am. v. Marion T, LLC*, 2010 U.S. Dist. LEXIS 47574, *26-27 (S.D. Ind. 2010) (the Indiana Supreme Court "has not spoken on the issue" of whether appraisers may consider causation).

---

[9] The Shifrins assert that Liberty and the contractor never reached an agreement because the agreement was not in writing and contracts in excess of $150 must be in writing under Indiana law.  [Dkt. 47 at 9 (citing Ind. Code § 24-5-11-10).]  Whether or not Liberty and the contractor had formed a valid contract for home improvement is irrelevant.  The point is that Liberty met with the Shifrins' chosen contractor, and they reached an agreement as to the cost of repairing the house (less some open items).  The Shifrins do not present any admissible evidence to contradict the fact that an agreement had been reached.

The Court has therefore turned to other jurisdictions for guidance.  In a factually similar case, the court in *Mapleton Processing v. Soc'y Ins. Co.*, 2013 U.S. Dist. LEXIS 96178 (N.D. Ia. 2013), explained the difference between arguing that an appraisal may not occur at all when causation issues remain versus arguing that, once an appraisal takes place, the appraiser may not determine issues of liability or coverage.  The court rejected the former argument.  There, the insured's property was damaged by a tornado and disputes arose during adjustment of the claim regarding whether cracking in the foundation was caused by the tornado or was preexisting.  The insurer's adjuster noted that some of the cracks had been painted in, meaning they had existed prior to the tornado.  The insurer's adjuster retained an engineer to inspect the foundation, prepared an estimate based on the engineer's report, and included the proposed repair for the cracks even though he doubted whether they were all caused by the tornado.  When the adjuster advised the insured what the payment to him would be ($21,836.77, which was the cost of all repairs less the policy deductible), the insured responded that the payment was "less than he anticipated," but that he would settle the claim for $30,000.  *Id.* at *6.  The insured then rescinded that offer, stating that he had obtained opinions that the damage caused by the tornado was far greater.

The insurer issued a check to the insured for $21,836.77 which the insured cashed, but the insured also hired a public adjuster and engineer who determined that the cost of repairs might exceed the value of the building.  The insurer's engineer inspected the property again, and disagreed with the insured's engineer's report.  The insured eventually requested an appraisal, but the insurer declined, reasoning that appraisal is inappropriate when disputes exist regarding causation or coverage.  The court found that appraisal was appropriate, even when issues of causation and/or coverage remained:

> I conclude that Society confuses the *scope and effect* of appraisal with the *availability* of appraisal.  The Policy itself includes no exceptions or limitations to the

effect that appraisal cannot be demanded if the parties disagree concerning causation or coverage.  Nor has the Iowa Supreme Court held that appraisal provisions in insurance policies should be construed narrowly.  By contrast, the Court has stated that contractual appraisal is a "favored" private procedure "because it serves as an inexpensive and speedy means of settling disputes."  (quoting *Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 260 (Iowa 1991)).

           \*          \*          \*

In short, there is a significant difference between arguing (a) appraisal is not appropriate when coverage and/or causation are in dispute and (b) when appraisal occurs, the appraisers are limited to valuation issues and may not address causation or coverage.  Few cases have held that a dispute over causation or coverage eliminates the contractual right to appraisal.  Most, as discussed above, hold only that the appraisers should stick to dollar amounts and stay away from making findings about causation or coverage.

           \*          \*          \*

I completely agree that the courts, and not the appraisers, must resolve coverage defenses and causation disputes.  But this does not mean there is no role for appraisal when those disputes arise.  A well-constructed appraisal, containing appropriate line items, can resolve "dollar amount" issues while reserving liability questions for the jury and/or the judge.  And, as one court has noted, a flawed or unhelpful appraisal can simply be ignored during subsequent litigation….Meanwhile, I see no justification for a rule that would allow either party to an insurance contract to nullify its appraisal provision simply by raising an issue of causation or coverage.

*Mapleton*, 2013 U.S. Dist. LEXIS 96178 at \*53-62 (emphasis in original).

The Court agrees with the *Mapleton* court's reasoning, and finds that Liberty was entitled to invoke the appraisal provision despite the fact that issues remained regarding which items of damage were caused by the tornado or Liberty's liability for that damage.  Appraisal can be a useful tool in this context, even where issues of causation may necessarily mix in with issues of loss.  Were the Court to accept the Shifrins' argument, appraisal could never take place even where small causation issues remain – as they do in almost every insurance claim.  *See, e.g.,* *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 892-93 (Tex. 2009) ("If [it] is correct that appraisers can never allocate damages between covered and excluded perils [such as wear and

tear], then appraisals can never assess hail damage unless a roof is brand new.  That would render appraisal clauses largely inoperative, a construction we must avoid").

And while issues of liability are better left to the courts, through the application of other policy provisions, the Policy here does not preclude invocation of the appraisal provision merely because causation issues remain.  *See, e.g.*, *TMM Investments, Ltd. v. Ohio Casualty Ins. Co.*, 730 F.3d 466, 473-74 (5th Cir. 2013) (insured's roof was damaged in hailstorm, insured invoked appraisal provision, and later argued appraisal process was flawed because insurer's appraiser had "improperly considered causation and coverage issues" in arriving at its appraisal award. Specifically, insured asserted that it was improper for the appraiser to attribute roof membrane damage to improper installation and skylight damage to rocks thrown from below.  Court noted that "[t]he line between liability and damage questions may not always be clear," and held that "appraisal panels are within their rights when they consider whether damage was caused by a particular event or was instead the result of non-covered pre-existing perils like wear and tear….To the extent the appraisers merely distinguished damage caused by pre-existing conditions from damage caused by the storm, they were acting within their authority"); *Molzan, Inc. v. United Fire & Cas. Co.*, 2009 U.S. Dist. LEXIS 63979, *12 (S.D. Tex. 2009) ("the parties agree that a covered event occurred but disagree about whether that event caused the damage to the claimed items….[A]n appraisal is appropriate to determine the amount of damage to these items….[T]he insured cannot avoid appraisal at this point merely because there could be a causation question outside the appraisal's scope").

### 3.   *Whether Liberty Has Waived the Appraisal Provision*

The Shifrins argue that Liberty has waived the appraisal provision by destroying or losing evidence (a "moisture report"), by refusing to pay for moisture remediation, and by not request-

ing appraisal within a reasonable time.[10]   [Dkts. 16 at 35; 47 at 24.]   Liberty responds that it is

not aware of a "moisture report" and never had one to destroy or lose, that it did not refuse to pay

for moisture remediation for moisture caused by the tornado, and that it did not delay in investi-

gating and adjusting the claim.   [*See* dkt. 79 at 11-13, 16-17, 26-27.]

Under Indiana law, "'contractual provisions of an insurance policy may be waived

or…the insurer may be estopped from asserting such provisions.'"   *Westfield Nat'l Ins. Co. v.*

*Nakoa*, 963 N.E.2d 1126, 1132 (Ind. Ct. App. 2012) (quoting *American Standard Ins. Co. of*

*Wisconsin v. Rogers*, 788 N.E.2d 873, 876 (Ind. Ct. App. 2003)).   While "[m]ere silence or inac-

tion on the part of an insurer is not sufficient to constitute express waiver," waiver can be im-

plied from "the acts, omissions, or conduct of one of the parties to the contract."   *Id.*   The Court

finds that Liberty has not taken any actions, or failed to take any actions, that would constitute its

waiver of the appraisal provision.

### a.   Moisture Report

The Shifrins do not present any evidence indicating that a moisture report existed, that

Liberty had a moisture report, or that Liberty intentionally destroyed a moisture report.   Their

only argument is that the Liberty claims log states that "[S]ervicemaster explained readings are

only good for a day," so "[o]f course, there was a moisture report."   [Dkt. 95 at 16.]   This is pure

speculation by the Shifrins, and not admissible evidence indicating any wrongdoing on the part

of Liberty, any waiver by Liberty of a Policy provision, or any entitlement to summary judgment

for the Shifrins.   *See Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (reiterating

---

[10] The Shifrins also argue that Liberty waived the appraisal provision by selecting a biased ap-
praiser.   [Dkt. 47 at 24-25.]   This argument will be addressed below and, in any event, it has no
merit.

that summary judgment "is the 'put up or shut up' moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events").

### b. Roof Repair and Moisture Remediation

The Shifrins argue that Liberty would not pay to have the roof repaired, that Liberty refused to pay for moisture remediation (including mold removal), and that "Liberty was desperate to avoid total loss by avoiding adjustment of most expensive repairs." [Dkt. 95 at 13.] Again, the Shifrins do not present any evidence supporting their arguments and the record evidence indicates otherwise. For example, as for the roof, Liberty advised the Shifrins numerous times that they needed to repair the roof and that Liberty would pay for the damage to the roof caused by the tornado, but the Shifrins would not choose a contractor and would not let Liberty contact a contractor directly on their behalf. [*See, e.g.*, dkt. 48-24 at 8, 10-12.] Instead, the Shifrins did not select a contractor and chose to not have the roof repaired.

As for moisture remediation inside the house, Liberty advised the Shifrins in an October 28, 2011 letter that "we will afford coverage for water remediation when the work has been performed. Please let me know when and who will be doing the drying so we can pay them directly when the remediation work is completed properly. The drying company should be taking steps to remediate any mold prior to their dry out and then contact me. This process can only take place once the roof has been replaced which has been discussed." [Dkt. 25-1 at 13; *see also* dkt. 48-23 at 2 (enclosing estimate which covered "full repairs of the home with some open items[,

s]pecifically…the remediation of the premises once the roof is replaced").].[11]  Liberty had advised the Shifrins on numerous occasions that, as required by the Policy provisions setting forth the Shifrins duties after loss, they had to first fix the roof before it would pay for remediation, since additional water damage could occur inside the house after remediation if the roof was still damaged and allowing water in.  [*See, e.g.*, dkts. 25-1 at 13; 25-2 at 3, ¶ 8.]  Liberty also advised the Shifrins that it would pay for mold removal during the remediation process.  [Dkt. 25-1 at 2, ¶ 6 (Mr. May advised the Shifrins "that water remediation would be paid when the work was performed, and offered to make payments directly to the remediation company, including mold remediation").]  There is no evidence that Liberty refused to pay for moisture remediation and, accordingly, that is not a basis for waiver of the appraisal provision.

### c.   Time for Requesting Appraisal

The Shifrins seek a declaration regarding "[w]hether defendant[']s demand was [to have] been made within a reasonable time under the circumstances of the case, or was the right to demand appraisal waived by defendant."  [Dkt. 16 at 35.]  To the extent the Shifrins are asserting that Liberty requested appraisal too late, somehow waiving the right to appraisal, the Court finds that nothing in the Policy sets a time limit for requesting appraisal and, in any event, the Shifrins have not presented any evidence that Liberty delayed in doing so.

---

[11] The Shifrins argue that Liberty's willingness to pay the mold remediation company directly violates the "Loss Payment" provision of the Policy, but it does not.  That provision allows Liberty to pay the insured "unless some other person is…legally entitled to receive payment," and also only requires payment once one of several conditions (an agreement between Liberty and the Shifrins, entry of final judgment, or the filing of an appraisal award) have been met – none of which have occurred here.  [Dkt. 25-3 at 2.]  Ignoring the Policy's Mortgage Clause, the Shifrins also argue that Liberty should not have made checks payable to both them and their mortgage company.  But the Policy requires that Liberty do so.  Both of these arguments underscore the disconnect between the Shifrins' view regarding what the Policy requires them and Liberty to do, and what the Policy provisions actually require of both parties.  [*Id.*]

### 4.  Liberty's Appraiser Selection

Liberty selected Paul Nash as its appraiser pursuant to the Policy's appraisal provision which allows each party to choose "a competent appraiser" and the two appraisers to choose an umpire.  [Dkt. 25-3 at 2.]  The Policy provides that the amount of loss is then set when the two appraisers agree on an amount, or when they submit their determination to the umpire and he or she agrees with one of the determinations.  [*Id.*]  The Shifrins' argument that Mr. Nash is some-how "partisan," [dkt. 47 at 13], is irrelevant because the Shifrins have refused to engage in the appraisal procedure.  Such an argument might be relevant if and after the appraisal process has taken place, but not now.  And, in any event, the Shifrins have not presented any evidence that Mr. Nash is not competent or is somehow biased.  Their argument that he has handled other claims for Liberty is of no consequence and does not show that he is incompetent or biased.[12] And Liberty is entitled to select an appraiser of its choosing.  The provision's requirement that the Shifrins also select an appraiser and that the two appraisers choose an umpire helps to ensure a fair process, but the Shifrins would not participate.  They cannot now challenge Liberty's se-lection of Mr. Nash, and that selection does not support any claim of waiver of the appraisal pro-vision.

### 5.  Bad Faith Invocation of Appraisal Provision

Finally, the Shifrins claim that Liberty acted in bad faith in invoking the appraisal provi-sion because causation is still an issue, [dkt. 47 at 23-24], and because Liberty invoked the ap-praisal provision immediately after the Shifrins disputed the findings of an engineer hired by

---

[12] The Court is aware of Indiana law precluding the retention of a biased appraiser, but the Shifrins have not presented any evidence that Mr. Nash is biased.  *See Atlas Constr. Co. v. Indi-ana Ins. Co.*, 160 Ind. App. 33, 38 (Ind. Ct. App. 1974) (a court will sustain an appraisal award in the absence of fraud, mistake, or misfeasance, but will set it aside if it is "so palpably wrong as to indicate corruption or bias on the part of the appraisers") (quoting *Lakewood Mfg. Co. v. Home Ins. Co. of N.Y.*, 422 F.2d 796, 798 (6th Cir. 1970)).

Liberty, [*id.* at 13]. As discussed above, Liberty was entitled to invoke the appraisal provision even though causation was still an issue. Doing so cannot support a bad faith claim. Additionally, when Liberty invoked the appraisal provision is irrelevant. There is nothing improper or unreasonable about Liberty seeking appraisal shortly after the Shifrins disputed the engineer's report -- especially when the dispute came after many other disputes and the Shifrins were continually expanding the claim scope. And neither the Policy nor Indiana law requires invocation of the appraisal process within a certain time period.

In sum, the Shifrins are not entitled to summary judgment on their claims for declaratory relief. Rather, the Court finds that Liberty properly invoked the Policy's appraisal provision; it did not waive that provision; its selection of Mr. Nash as an appraiser was entirely proper; and it did not invoke the appraisal provision in bad faith. Accordingly, given that invocation of the appraisal process was proper and that the Shifrins refused to participate, their refusal is an additional basis for the Court to conclude that the Shifrins did not comply with the Policy provisions prior to filing suit. The Court denies the Shifrins' Motion for Summary Judgment on their claims for declaratory judgment with respect to the appraisal and grants Liberty's Motion for Summary Judgment as to those claims.

### C.  Remaining Affirmative Claims

The Court notes that Liberty has not asked the Court to determine the scope of the Policy's coverage, nor to decide whether the Policy precludes coverage for the tornado-related loss based on the Shifrins' refusal to repair the roof or engage in the appraisal process. And the Court makes no finding with respect to either of those issues. Thus far, it has resolved on the issue presented: that the Shifrins cannot institute this action against Liberty because they failed to repair the roof or to engage in the appraisal process. However, the parties have fully briefed and sought

a ruling on the remaining issues, and again in the interest of completeness, the Court will address the Shifrins' remaining claims.  *See, e.g.*, *Stephenson v. Wilson*, 619 F.3d 664, 666 (7th Cir. 2010) ("Stephenson argued other grounds for relief as well, but the district judge didn't rule on any of them.  That may have been a mistake, considering how protracted…cases are.  It means that if we reject the ground on which the court did rule, we must reverse and remand for consideration of the other grounds, while if those grounds for relief had been before us we might have agreed with one of them and thereby spared the parties a further proceeding in the district court, possibly followed by a further appeal").

### 1. Breach of Contract Claim

In connection with their breach of contract claim, the Shifrins allege that Liberty, among other things, did not act in good faith, delayed investigation, misrepresented the Policy, did not comply with the Policy terms, made untruthful statements, and withheld payment of benefits. [Dkt. 16 at 36-38.]  In support of their Motion for Summary Judgment on the breach of contract claim, the Shifrins state that Liberty "went above and beyond honest conduct.  Delaying, creating Mexican standoffs, hiring questionable third party candidates to avoid paying for something that should have been covered."  [Dkt. 47 at 49.]  Liberty responds that it has complied with the Policy, and has done nothing improper.  [*See* dkt. 79.]

While the Shifrins list a litany of things that they argue Liberty did wrong, it is not clear which of those things relate to their breach of contract claim.  They appear to focus this claim on their argument that Liberty should have adjusted the whole claim, including interior water damage, at the outset – apparently hoping that the house would be "totaled" and they could "cash out."  [*See* dkt. 95 at 3.]  But they do not point to any Policy provision which would require Liberty to adjust the claim in that fashion, a necessary element for a breach of contract claim.  *See*

*Corry v. Jahn*, 972 N.E.2d 907, 913 (Ind. Ct. App. 2012) (elements of breach of contract claim are "the existence of a contract, the defendant's breach thereof, and damages").[13]

Additionally, as Liberty explained to the Shifrins numerous times, it could not tell the extent of the interior damage until the damage was remediated by opening up and drying the walls. Doing so before the roof was repaired would have been irresponsible and imprudent, as additional water leakage could – and admittedly did – occur before repair of the roof took place. Liberty's adjustment of the claim in stages, with the first stage addressing the immediate need of replacing the roof, was not a breach of the Policy, and the Shifrins have not provided any evidence that it was.[14]  In short, the Shifrins have not presented admissible evidence indicating that Liberty breached any Policy provisions, and their breach of contract claim fails as a matter of law.

### 2.  *Negligence and Gross Negligence*

The Shifrins allege that Liberty acted negligently by failing to repair the roof, [dkt. 47 at 15-16 ("If defendant saw some adverse roof condition, call your contractor and get it fixed the same day")], and was grossly negligent for failing to "pay for critical moisture remediation service for a flooded house and refus[ing] to allow the homeowner to open flooded walls," [*id.* at 16].  Liberty responds that it was the Shifrins' responsibility to repair the roof, and that it has not refused to pay for moisture remediation but merely wanted the Shifrins to repair the roof first. [Dkt. 79 at 6-9; 11-13.]

To prevail on a negligence claim, "a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the

---

[13] The Court finds Mr. Shifrin's statements regarding what a contractor told him (that "no prudent person would ever try to repair this house"), [dkt. 48-1 at 30], are inadmissible hearsay.

[14] To the extent the Shifrins argue that Liberty's estimates were too low, that is an issue best decided through the appraisal process, which Liberty properly initiated and in which the Shifrins are legally obligated to participate.

plaintiff proximately caused by the breach." *Peters v. Forster*, 804 N.E.2d 736, 738 (Ind. 2004) (citing *Benton v. City of Oakland City*, 721 N.E.2d 224, 232 (Ind. 1999)). Summary judgment is rarely appropriate in negligence cases, as they are particularly fact sensitive. *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004). "Nevertheless, a defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim." *Haire v. Parker*, 957 N.E.2d 190, 195 (Ind. 2011) (citing *Rhodes*, 805 N.E.2d at 385).

Fatal to the Shifrins' negligence claim is the fact that Liberty did not owe them a duty to repair the roof. As discussed above, the Court finds that the Policy required the Shifrins, and not Liberty, to make that repair. The Shifrins have not introduced any admissible evidence indicating that Liberty somehow waived the "Your Duties After Loss" provision, which unequivocally required the Shifrins to "[p]rotect the property from further damage." [Dkt. 25-2 at 26.] Liberty cannot have acted negligently by failing to do something that it was not required to do.

Similarly, the Shifrins' gross negligence claim fails as a matter of law because Liberty had no duty to pay for moisture remediation before the roof was repaired. *See N. Ind. Pub. Serv. v. Sharp*, 790 N.E.2d 462, 465-66 (Ind. 2003) (negligence and gross negligence have the same elements – duty, breach, and injury). The Shifrins do not point to any Policy language requiring Liberty to do so and, as discussed above, it makes perfect sense that the interior of the house be repaired only after the roof is repaired, to prevent damage to the repaired interior from a still-leaking roof. What is more, Liberty has consistently and explicitly agreed to pay for moisture remediation for the interior of the house – just after the roof is repaired. [*See, e.g.*, dkts. 25-1 at 13; 48-23 at 2.] The Shifrins' negligence and gross negligence claims fail as a matter of law.

### 3. Bad Faith

The Shifrins allege that Liberty has breached the "duty of good faith and fair dealing" by wrongfully invoking the appraisal procedure, losing or destroying a "moisture report," delaying its investigation, and "giving [the] engineer narrow instruction to only investigate racking damage." [Dkt. 16 at 40.]  They also allege that Liberty breached the "implied covenant of good faith and fair dealing" based on numerous perceived shortcomings in Liberty's claims handling. [*Id.* at 40-42.]  The Shifrins assert that it was bad faith for Liberty to "with[o]ld funds to water remediate the house, mold remediate the house, delay[] investigation, create[] Mexican Standoffs, deceiv[e] [them], [and] lie[] to [them] and [the] Indiana Insurance Commissioner."  [Dkt. 47 at 49.]  Liberty argues that it "reasonably requested necessary documents to adjust the claim, timely investigated the claim, and made payments for damages," and "rightfully, and properly invoked the mandatory appraisal process."  [Dkt. 25 at 17.]

"Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured."  *Allstate Ins. Co. v. Fields*, 885 N.E.2d 728, 732 (Ind. Ct. App. 2008).  This duty includes "the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim."  *Id.*  "[A] good faith dispute about the amount of a valid claim" cannot support a bad faith claim, and "the lack of diligent investigation alone is not sufficient to support an award."  *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518 (Ind. 1993).  Rather, "[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.  A bad faith determination inherently includes an element of culpability."  *Lumbermans Mut. Cas. Co. v. Combs*, 873 N.E.2d 692, 714 (Ind. Ct. App. 2007).

The Court has already found as a matter of law that Liberty has not acted negligently in handling the Shifrins' claim.  Accordingly, it cannot have acted in bad faith.[15]  *See id.* at 714 (on top of elements of negligence, insured must prove "additional element of conscious wrongdoing….").  To reiterate, Liberty properly invoked the appraisal provision, there is no evidence that Liberty lost or destroyed a "moisture report," Liberty did not delay its investigation, and there is no evidence that Liberty has breached any Policy provisions in adjusting the Shifrins' claim.[16] Simply put, Liberty has not acted in bad faith in connection with the Shifrins' claim up to this point, and the Shifrins bad faith claims fail as a matter of law.[17]

---

[15] To the extent the Shifrins argue that Liberty refused to cover the cost of making the house comply with code requirements, the Court finds that the evidence indicates the opposite.  [*See* dkt. 48-23 (Mr. Fearrin stated in email enclosing estimate that it covered "full repairs of the home with some open items," including "any code requirements…").]  The Court also rejects any argument that Liberty acted in bad faith by failing to cooperate during discovery in this case. [Dkt. 47 at 22.]  Post-litigation conduct is not relevant to a bad faith claim, and the Shifrins can address any issues through discovery motions filed in this case – as they have already done, [*see, e.g.*, dkt. 69 (the Shifrins' Motion to Compel)].

[16] The Shifrins also argue that Liberty improperly declined to renew the Policy after they filed a complaint with the Indiana Department of Insurance.  [Dkt. 47 at 10.]  Mr. Shifrin stated in his affidavit "[t]here was no 30 days cancellation notice."  [Dkt. 48-1 at 17.]  Significantly, Liberty did not cancel the Policy, but instead decided not to renew it.  And Mr. May attached a non-renewal notice dated July 5, 2011 to his affidavit, which was more than 30 days before the Policy term expired.  [Dkt. 80-3.]  The Policy allowed Liberty to decline renewal with thirty days' notice to the Shifrins before expiration of the Policy period.  [Dkt. 25-3 at 8.]  And, in any event, the Shifrins have not provided any evidence that Liberty's decision not to renew the Policy related to the Indiana Department of Insurance complaint or was in retaliation for some other action by the Shifrins.

[17] The Court is unable to understand the Shifrins' argument that Liberty gave the engineer "narrow instruction to only investigate racking damage on the policy that clearly covered any high wind damages, over liability."  [Dkt. 16 at 40.]  To the extent that the Shifrins are claiming Liberty hired a biased engineer, they have not presented any admissible evidence that this was the case, nor have they pointed to any Policy provisions preventing Liberty from hiring an engineer of its choosing.  Additionally, Liberty informed the Shifrins that they could hire their own engineer to inspect the damage, and repeatedly requested documents to support the Shifrins' disputes with the Donan report.  There is no evidence that the Shifrins had an engineer of their own choosing inspect the house, nor that they submitted any documentation indicating why they disagreed with the Donan report.

### 4.   *Fraud/Constructive Fraud/ Intentional Misrepresentation*

As with some of the Shifrins' other claims, it is difficult for the Court to discern which al-

legations of wrongdoing relate to the claim for fraud, constructive fraud, and intentional misrep-

resentation.  It appears that the Shifrins base this claim on their arguments that Liberty allegedly:

(1) lied to them when it told them the roof tarps were badly deteriorated, and thus that the

Shifrins were not complying with the "Your Duties After A Loss" Policy provision, [dkt. 47 at

11]; (2) lied to them when it claimed it did not have an engineer report but really did, [*id.*]; (3)

submitted an altered Policy page with its motion for summary judgment, [*id.* at 19-20]; and (4)

lied to the Indiana Department of Insurance when it represented that the Shifrins had not provid-

ed all necessary estimates, [*id.* at 20].

Liberty responds that: (1) the protection of the roofs was temporary, and the Shifrins had

a duty to permanently repair the roof, [dkt. 79 at 19]; (2) the evidence presented by the Shifrins

shows only that the engineer's report was in transit, and not that Liberty had received it, [*id.* at

19-20]; (3) the Shifrins have not identified any material discrepancies between the Policy sub-

mitted by Liberty and the Policy submitted by the Shifrins, [*id.* at 23-24]; and (4) the Shifrins

have not identified any false statements Liberty made to the Department of Insurance, [*id.* at 16].

In Indiana, the elements of fraudulent misrepresentation are that: "(1) the defendant made

false statements of past or existing material fact; (2) the defendant made the statements knowing

them to be false or made them…recklessly without knowledge of their truth or falsity; (3) the

defendant made the statements to induce the plaintiff to act upon them; (4) the plaintiff justifi-

ably relied and acted upon the statements; and (5) the plaintiff sustained damages as a proximate

result."  *Smith v. State Farm Fire & Cas. Co.*, 2012 U.S. Dist. LEXIS 157400, *7 (N.D. Ind.

2012) (citing *Haire v. State Farm Fire & Cas. Co.*, 2011 U.S. Dist. LEXIS 116376, *6-7 (N.D.

Ind. 2011)).  Under Indiana law, a fraud claim "cannot be based on a misrepresentation of law or on a promise to be performed in the future."  *Smith*, 2012 U.S. Dist. LEXIS 157400 at *7-8.  The elements of constructive fraud are: (1) a duty that the defendant owes to the plaintiff by virtue of their relationship; (2) violation of that duty through "the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists"; (3) reliance by the plaintiff; (4) injury to the plaintiff as a proximate result thereof; and (5) the gaining of an advantage by the defendant at the plaintiff's expense.  *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996).

Each of the Shifrins' bases for their fraud, constructive fraud, and intentional misrepresentation claims fail as a matter of law.  First, the Court has already found as a matter of law that it was the Shifrins' responsibility to repair the roof, not Liberty's duty.  Even if the tarps were not deteriorated and could constitute an adequate repair under the "Your Duties After A Loss" section of the Policy – which the Court finds to be highly doubtful – any representations Liberty made about the conditions of the tarps do not constitute fraud.  In order to prevail on such a claim, the Shifrins would have to show that Liberty's statements induced them to act and they were injured as a result.  But it is undisputed that the Shifrins *did not act* based on Liberty's statements that the tarps were damaged and that they needed to repair the roof.  To the contrary, nothing in the record indicates that the roof has been repaired even to this day.  Accordingly, Liberty's statements regarding the poor condition of the tarps and the need to repair the roof, even if false, would not constitute fraud.

Second, the Shifrins' allegations that Liberty said it did not have the engineer report when it did also cannot form the basis of a fraud/constructive fraud/intentional misrepresentation claim.  The Shifrins do not explain the significance of such a misrepresentation, even if it actual-

ly occurred.  They do not argue that they somehow relied on the statement to their detriment – indeed, they argue that they discovered the same day as the alleged misrepresentation that the engineer had already sent the report to Liberty.  This representation, better characterized as a mix-up, is not fraudulent.

Third, in perhaps their most confounding claim of all, the Shifrins argue that Liberty altered a Policy page which listed the insured residence premises as "SAME AS MAIL AD-DRESS," while their version of the Policy listed it as "Same as mailing address above."  [Dkt. 47 at 19.]  Even assuming such a discrepancy exists, the Shifrins fail to provide any explanation regarding why the discrepancy matters.  The Court concludes that it does not.

Finally, the Shifrins argue that Liberty made misrepresentations to the Indiana Department of Insurance, perhaps regarding the Shifrins' alleged failure to provide Liberty with estimates.  [*Id.* at 20.]  Again, they have not provided any evidence that they somehow relied on statements allegedly made to the Indiana Department of Insurance, much less that they relied to their detriment and were damaged.  The Shifrins' fraud/constructive fraud/intentional misrepresentation claim fails as a matter of law.

### 5. *Negligent Infliction of Emotional Distress*

In connection with their negligent infliction of emotional distress claim, the Shifrins argue that Liberty has acted negligently, which has caused them "severe emotional, physical injury and upset [and Liberty has] shown no care or regard to [their] well being."  [Dkt. 16 at 44.]  Liberty argues that a claim for negligent infliction of emotional distress can only survive where the plaintiff has sustained an impact or witnessed an accident.  [Dkt. 25 at 17.]

The Court agrees with Liberty that in Indiana actions seeking damages for negligent infliction of emotional distress have been recognized in two situations: "where the plaintiff has (1)

witnessed or come to the scene soon thereafter the death or severe injury of certain classes of rel-

atives (i.e., the bystander rule…) or (2) suffered a direct impact (i.e., the modified impact

rule…)." *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011).  The Shifrins have not even re-

motely alleged that either of these circumstances were present, nor have they responded to Liber-

ty's argument that those allegations are lacking.  [*See* dkt. 95.]  For this reason, their negligent

infliction of emotional distress claim fails.

### 6.   *Intentional Infliction of Emotional Distress*

The Shifrins allege that Liberty engaged in a scheme to deprive them of insurance cover-

age, which caused emotional distress by "delaying, devaluing, [and] denying" their claim.  [Dkt.

16 at 43.]  Liberty responds that the conduct the Shifrins allege it engaged in would not "remote-

ly come close to satisfying the requisite outrageous conduct" required for an intentional infliction

of emotional distress claim.  [Dkt. 25 at 18.]

To prove their claim of intentional infliction of emotional distress, the Shifrins must es-

tablish that Liberty: "(1) engage[d] in extreme and outrageous conduct (2) which intentionally or

recklessly (3) cause[d] (4) severe emotional distress to [the plaintiff]." *Curry v. Whitaker*, 943

N.E.2d 354, 361 (Ind. Ct. App. 2011).  Liability for intentional infliction of emotional distress

"has been found only where the conduct has been so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and ut-

terly intolerable in a civilized community." *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App.

1999).

The Shifrins have not put forth any evidence showing that Liberty acted with an intent to

harm them emotionally, or recklessly did so.  And the Court has already found that Liberty has

not done anything wrong up to this point in the claims adjustment process.  Absent evidence of

- 36 -

some wrongdoing – and wrongdoing that is intentional – the Shifrins' intentional infliction of emotional distress claim fails as a matter of law.

In sum, the Court finds that there is no evidence that Liberty has engaged in any wrong-doing thus far in the handling of the Shifrins' claim.  It properly invoked the appraisal provision and has not breached any Policy provisions.  Further, there is no evidence that it has engaged in any type of bad faith.  Because the Shifrins have not presented admissible evidence to support their claims, they fail as a matter of law.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Liberty's Motion for Summary Judgment, [dkt. 24], and **DENIES** the Shifrins' Cross-Motion for Summary Judgment, [dkt. 46].  Judgment will enter accordingly.  Further, the Court **DENIES AS MOOT** the Shifrins' Request for Expe-dited Consideration, [dkt. 103],[18] and the other pending motion [dkt. 105].

01/09/2014

_Jane Magnus-Stinson_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

---

[18] The Shifrins' Request for Expedited Consideration was based in large part on Mr. Shifrin's claim that he is a federal government employee and that "[t]he current Federal Government Shutdown severely and adversely impacts the ability of plaintiffs to pay for the uninhabitable residence damaged by the tornado."  [Dkt. 103 at 1.]  The government shutdown ended twelve days after the Shifrins filed their Request, thus alleviating the need for any expedited consideration.

**Distribution via ECF only:**

Pfenne Peter Cantrell
KIGHTLINGER & GRAY
pcantrell@k-glaw.com

**Distribution via U.S. Mail:**

BRIAN SHIFRIN
11418 Altamount Dr.
Fortville, IN 46040

MELANIE SHIFRIN
11418 Altamount Dr.
Fortville, IN 46040